UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEANNIE REIMBOLD,

        Plaintiff,                                Hon. Ellen S. Carmody

v.                                                    Case No. 1:05-CV-455

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

**OPINION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. On September 21, 2005, the parties consented to proceed before the undersigned for all further proceedings, including an order of final judgment. 28 U.S.C. § 636(c)(1). By Order of Reference, the Honorable Richard Alan Enslen referred resolution of this matter to this Court. (Dkt. #8).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 45 years of age at the time of the ALJ's decision. (Tr. 15). She successfully completed high school and worked previously as a food handler. (Tr. 15, 58, 66-69).

Plaintiff applied for benefits on February 6, 2002, alleging that she had been disabled since August 2, 2001, due to heart murmur, bladder problem, left knee injury, back injury, neck injury, right and left wrists, gallbladder surgery, irritable bowel suyndrome, asthma, allergies, gastrointestinal esophageal reflux disease (GERD), right elbow and arm, and bone spur. (Tr. 50A-50C, 52). Her application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 28-50). On June 9, 2004, Plaintiff appeared and testified before ALJ Adrian Sannier.[1] (Tr. 389-510). This initial hearing was continued to permit Plaintiff the opportunity to submit additional medical evidence. (Tr. 408-510). On October 18, 2004, Plaintiff appeared before ALJ Patricia Hartman, with testimony being offered by Plaintiff and vocational expert, Donald Hecker. (Tr. 511-640). In a written decision dated March 22, 2005, ALJ Hartman determined that Plaintiff was not disabled as defined by the Act. (Tr. 14-23). The Appeals Council declined to review the ALJ's decision, rendering it the Commissioner's final decision in the

---

[1] The administrative record initially submitted by Defendant contains the administrative hearing transcript of another individual (Donald Rummerfield). (Tr. 389-423). Defendant later submitted a supplement containing the transcripts of the two administrative hearings conducted in Plaintiff's case. (Dkt. #9, 11). References to the administrative hearing transcript refer to the (misnumbered) contents of Defendant's supplemental submission.

matter. (Tr. 11-13). Plaintiff subsequently appealed the matter in this Court pursuant to 42 U.S.C. § 405(g).

## **MEDICAL HISTORY**

On August 27, 1999, Plaintiff reported to the emergency room complaining of pain in her lower back and left calf. (Tr. 100). Straight leg raising was "questionably" positive and an examination of Plaintiff's back revealed "mild" tenderness of the right sacroiliac area. (Tr. 101). X-rays of Plaintiff's lumbosacral spine revealed "mild" articular facet arthritis at L5-S1 and a decrease in height of the L5-S1 intervertebral disc consistent with degenerative disc disease. (Tr. 103). There was, however, no evidence of spondylolisthesis or spondylolysis. *Id.*

On November 18, 1999, Plaintiff was examined by Dr. Christopher Abood. (Tr. 209-12). Plaintiff reported that she was experiencing lower back pain which radiated into her left lower extremity. (Tr. 209). Palpation of Plaintiff's spine produced no tenderness. (Tr. 211). Plaintiff walked with a normal gait and her range of motion was within normal limits. An examination of Plaintiff's lower extremities revealed 5/5 strength. Straight leg raising was negative. An MRI of Plaintiff's lumbar spine revealed that "the disc space heights down to L5 are within normal limits." However, at L5-S1 the examination revealed "a loss of disc space height with almost bone-on-bone appearance." *Id.* Dr. Abood told Plaintiff that he would recommend surgery only as a "last resort." (Tr. 212). Plaintiff indicated that she preferred to continue with non-surgical treatment. *Id.*

On December 29, 1999, Plaintiff was examined by Dr. Richard Ferro. (Tr. 149-52). Plaintiff reported that she was experiencing pain in her lower back and lower leg. (Tr. 149). Straight leg raising was "mildly" positive on the left and negative on the right. (Tr. 151). Flexion of

4

Plaintiff's lower back produced pain, but no evidence of radiation was observed. Motor, sensory, and reflex examinations of Plaintiff's lower extremities were unremarkable. The doctor decided to treat Plaintiff with a series of nerve root injections. *Id.* Between January 6, 2000, and February 10, 2000, Plaintiff received three such treatments. (Tr. 143-48).

On March 6, 2000, Plaintiff underwent arthroscopic surgery on her left knee, performed by Dr. Julie Dodds, to correct the "recurrent patellar dislocation" which Plaintiff had recently been experiencing. (Tr. 126-27). On March 21, 2000, Plaintiff reported that her left knee "feels better." (Tr. 123). An examination revealed "minimal" knee swelling and no evidence of calf tenderness. *Id.*

On June 15, 2000, Plaintiff participated in a doppler venous ultrasound examination of her left lower extremity, the results of which revealed no evidence of deep venous thrombosis. (Tr. 122). On July 13, 2000, Plaintiff was examined by Dr. Dodds. (Tr. 121). An examination of Plaintiff's left knee revealed full flexion and full extension, but a "tight lateral retinaculum and decreased patellar mobility." The doctor suggested that Plaintiff undergo a second arthroscopic procedure to "free up some of the adhesions in her knee." *Id.* Plaintiff agreed and underwent a second arthroscopic procedure on August 21, 2000. (Tr. 118-19, 121).

On October 17, 2000, Plaintiff was examined by Dr. Dodds. (Tr. 116). Plaintiff reported that she was "doing fairly well." An examination of her knee revealed "improved quad bulk. . .full range of motion. . .no effusion. . .[and] mild patellofemoral crepitance." Dr. Dodds concluded that Plaintiff could return to work subject to the following restrictions: (1) minimal squatting and stair climbing, (2) no kneeling, and (3) she can push/pull no more than 20 pounds. *Id.*

5

When examined on January 9, 2001, Plaintiff reported that she was "doing well with her current work restrictions." (Tr. 110). An examination of Plaintiff's left knee was unremarkable and Dr. Dodds decided to continue Plaintiff's work restrictions. She also instructed Plaintiff to participate in physical therapy. *Id.*

On April 12, 2001, Plaintiff returned to Dr. Abood. (Tr. 205-08). A physical examination was unremarkable, but the results of an MRI revealed "a severely degenerative L5-S1 disc with collapsed disc space height." (Tr. 207). However, there was no evidence of nerve root compression or spinal stenosis. *Id.* Because Plaintiff had not recently participated in therapy to treat her back, Dr. Abood instructed Plaintiff to participate in physical therapy. (Tr. 208).

Plaintiff was discharged from physical therapy on May 23, 2001, at which time she reported that while her mobility had improved, her back pain had not. (Tr. 203). Dr. Abood then recommended that Plaintiff participate in a lumbar discography[2] examination to determine whether surgery was warranted. (Tr. 199). The results of the discography revealed "significant" pain reproduction at L5-S1. (Tr. 133-35, 198). An examination of the L3-4 and L4-5 discs revealed that they were "anatomically normal." (Tr. 135). On August 7, 2001, Plaintiff underwent L5-S1 fusion surgery (with the placement of titanium cages[3]), performed by Dr. Abood. (Tr. 195-96).

---

[2] Discography is a procedure used to determine if intervertebral discs are the source of a patient's pain. *See* Neurologic Diagnostic Tests and Exams, available at www.meditec.com/neurological-examination.html (last visited on July 31, 2006).

[3] Interbody fusion devices (such as titanium cages) are placed in the disc space and function as internal splints, holding the vertebrae together while fusion occurs. They also help to restore height to painful collapsed discs and relieve painful pressure on nerves. The cages are porous and allow the bone graft to grow from the vertebral body through the cage and into the next vertebral body. The cages offer excellent fixation, so most patients do not need additional instrumentation (e.g. pedicle screws) or post-operative back braces for support. This procedure also allows the spine to be fused with less post-operative discomfort. *See* Interbody Cages for Spine Fusion, available at, http://www.spine-health.com/Topics/surg/overview/lumbar/lumb09_cage.html (last visited on August 1, 2006); Interbody Spinal Fusion Implants Illustrate Advances in Spine Fusion Technologies, available at, http://www.medcompare.com/spotlight.asp?spotlightid=80 (last visited on August 1, 2006).

X-rays of Plaintiff's lumbar spine, taken on August 8, 2001, revealed that the titanium cages were "in place" and that "anatomic alignment is maintained." (Tr. 193). There was no evidence of fracture or disc space abnormality, the sacroiliac joints were normal and symmetric, and the remainder of the pelvis was intact. *Id.*

On September 7, 2001, Plaintiff participated in an MRI examination of her cervical spine, the results of which revealed a "small" herniation at C6-7 with no evidence of nerve root compromise. (Tr. 172-73). The examination was otherwise unremarkable, revealing "normal" alignment of Plaintiff's cervical spine. *Id.*

On September 27, 2001, Plaintiff was examined by Dr. Abood. (Tr. 190). Plaintiff reported that she was "doing well and has had significant improvement in her symptoms." *Id.* X-rays of Plaintiff's lumbar spine revealed that the "body height and disc spaces are satisfactorily maintained" with "no change in alignment." (Tr. 171).

On October 19, 2001, Plaintiff fell injuring her right arm. (Tr. 230). On October 22, 2001, Plaintiff was examined by Dr. Erich Hornbach. (Tr. 228-30). X-rays of Plaintiff's right upper extremity revealed that she suffered a "radial[4] head and neck fracture with minimal angulation or translation." (Tr. 230). Plaintiff also reported experiencing wrist pain as well. (Tr. 229). However, when her wrist was examined, Plaintiff provided "completely inconsistent" responses regarding the source of her pain. There was no evidence of contusions, swelling, or abrasions and Plaintiff exhibited full range of digital motion. *Id.* Moreover, Plaintiff's responses to Tinel's testing[5] were

---

[4] The radius is the bone of the forearm which is on the outer (i.e., thumb) side of the forearm. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* R-20 (Matthew Bender) (1996).

[5] Tinel's test (or Tinel's sign) refers to a tingling sensation at the end of a limb produced by tapping the nerve at a site of compression or injury. This test is also used to detect the presence of carpal tunnel syndrome. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* T-140 (Matthew Bender) (1996); Frank L. Urbano, M.D., *Tinel's Sign and Phalen's Manuever:*

7

"completely non-anatomic." (Tr. 228-29). X-rays revealed no fracture or injury to Plaintiff's wrist. (Tr. 230). Dr. Hornbach concluded that Plaintiff's elbow could be treated "with splinting." (Tr. 228). The doctor further reported that he was "unsure of the etiology of [Plaintiff's] wrist pain" as her "examination was inconsistent multiple times." *Id.* A subsequent bone scan of Plaintiff's right wrist revealed "no focal area of increased activity that would suggest the presence of fracture or acute process." (Tr. 227).

On November 5, 2001, Plaintiff was examined by Dr. Hornbach. (Tr. 226). An examination of Plaintiff's right elbow revealed 30 to 105 degrees of motion with minimal tenderness over the radial head. The examination was otherwise unremarkable. With respect to Plaintiff's continued report of right wrist pain, the doctor observed that there was "no evidence of acute fracture in her right wrist" and "[h]er major ligamentous structures do appear to completely intact." Dr. Hornbach concluded that Plaintiff's "symptoms out weigh her physical exam findings." *Id.*

X-rays of Plaintiff's lumbar spine, taken on November 21, 2001, were "normal." (Tr. 189).

On December 3, 2001, Plaintiff was examined by Dr. Abood. (Tr. 188). Plaintiff reported that she "has done well following the surgery and had improvement in her back pain." X-rays of Plaintiff's lumbar spine revealed that "the bone grafts and cages are in good position." *Id.*

On February 14, 2002, Plaintiff participated in an MRI examination of her right elbow, the results of which revealed: (1) a "healing fracture of the neck of the radius;" (2) a "very small" osteochondral lesion "without definite free fragment;" and (3) that her tendons and ligaments were "intact." (Tr. 221-22). An MRI of Plaintiff's right wrist, performed the same day, was

---

*Physical Signs of Carpal Tunnel Syndrome*, Hospital Physician, July 2000 at 39.

"negative. . .except for [a] small amount of benign cystic changes within the trapezoid bones." (Tr. 220).

On February 25, 2002, Plaintiff was examined by Dr. Hornbach. (Tr. 219). Plaintiff reported that she was experiencing "diffuse" pain in her upper right arm, as well as "vague wrist pain everywhere." An examination of Plaintiff's upper arm, elbow, and wrist was unremarkable. The doctor concluded that he could not determine the etiology of Plaintiff's complaints. He further stated with respect to Plaintiff's wrist, that he "cannot find anything wrong." *Id.*

On March 18-19, 2002, Plaintiff participated in a functional capacity evaluation, conducted by occupational therapist Thomas Lilley. (Tr. 178-86). Based on Plaintiff's performance, the therapist concluded that Plaintiff can occasionally lift and carry 10 pounds. (Tr. 181-83). Plaintiff demonstrated the ability to sit for an entire 8 hour day, provided she has the opportunity to arise from her chair once each hour. (Tr. 185). Plaintiff was able to walk one-quarter mile and demonstrated the ability to occasionally stand during an 8-hour workday. *Id.* The therapist concluded that Plaintiff is "capable of performing full time work within the sedentary or sedentary-light work levels" provided she is able to "get out of a sitting position once per hour to change positions for short durations of time to prevent stiffness in her low back and legs." (Tr. 180).

Dr. Hornbach agreed with Mr. Lilley's conclusions, except as pertains to Plaintiff's ability to use her right upper extremity. (Tr. 216). With respect to Plaintiff's right upper extremity, Dr. Hornbach identified the following restrictions: (1) Plaintiff cannot use her right upper extremity to perform pushing, pulling, or tugging activities; (2) she cannot perform work above shoulder level; (3) she cannot reach distances greater than 40 inches; and (4) she cannot perform repetitive gripping

9

or pinching. Dr. Hornbach concluded that despite these limitations Plaintiff was capable of performing sedentary work. *Id.*

In an attempt to ascertain the source of her right upper extremity pain, Plaintiff participated in an EMG and nerve conduction examination on June 10, 2002. (Tr. 235-38). The results of this examination revealed "mild to moderate" entrapment of the median nerves, without evidence of degeneration. However, there was "no evidence of any cervical radiculopathy, plexopathy or peripheral neuropathy." *Id.*

On October 23, 2002, Plaintiff participated in a lumbar myelogram examination, the results of which revealed "that her spinal canal is patent" with "no evidence of nerve root compression." (Tr. 330). The instrumentation from her previous spinal fusion surgery was "in adequate position." *Id.*

On December 28, 2002, Plaintiff began treating with the Sparrow Regional Pain Management Center. (Tr. 282-83). Between the dates of February 2, 2003, and March 26, 2003, Plaintiff received a series of five lumbar epidural steroid injections. (Tr. 275-77, 280-81).

As part of her pain clinic treatment, Plaintiff met with Camala Riessinger, Ph.D., on March 4, 2003. (Tr. 278-79). Plaintiff indicated that she "needs some help in learning some positive pain coping strategies." (Tr. 278). Riessinger diagnosed Plaintiff with (1) adjustment disorder with anxiety and (2) dysthymic disorder. Plaintiff's GAF score was rated as 60.[6] *Id.*

---

[6] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994). A score of 60 indicates that the individual is experiencing "moderate symptoms or moderate difficulty in social, occupational, or school functioning." *Id.* at 34.

The lumbar epidural steroid injections Plaintiff received temporarily reduced her pain by 50 percent. (Tr. 273). In light of Plaintiff's "favorable response" to this treatment, the physicians at the pain clinic decided to treat Plaintiff with a series of two lumbar rhizotomy[7] procedures, which were performed on May 29, 2003, and June 9, 2003. (Tr. 273, 346).

On August 18, 2003, Plaintiff participated in a functional capacities evaluation, conducted by occupational therapist Rosalie Bellingar. (Tr. 315-27). Based on Plaintiff's performance, Bellingar concluded that Plaintiff "is able to work at the sedentary physical demand level for activity above the waist and the sedentary light physical demand level for activity below the waist." *Id.*

On September 23, 2003, Plaintiff reported to Dr. Riessinger that she "is having excellent pain relief" and was "doing extremely well at coping and managing with her pain and symptoms." (Tr. 314). Plaintiff was instructed to continue performing her prescribed program of stretching and walking. *Id.*

On October 27, 2003, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed that the L1-L2, L2-L3, and L3-L4 disc spaces were "unremarkable" with no evidence of stenosis. (Tr. 294-96). There was evidence of "mild" narrowing and desiccation at L4-L5 with no evidence of stenosis. At L5-S1, the examination revealed "some" encasement of the S1 nerve roots, but there was no evidence of signal abnormality, neural structure impingement, or other pathologic enhancement. *Id.*

---

[7] Patients who are candidates for rhizotomy typically have undergone several facet joint injections to verify the source and exact location of their pain. The goal of a rhizotomy treatment is to provide relief by "shutting off" the pain signals that the joints send to the brain. The pain relief experienced by most patients who have this procedure lasts months or even years. *See* Facet Rhizotomy, available at http://www.spineuniverse.com/displayarticle.php/article200.html (last visited on August 2, 2006).

On April 15, 2004, Plaintiff returned to the pain clinic, complaining of bilateral low back pain. (Tr. 344). Plaintiff reported that her back pain rated a 6 (on a scale of 1-10) and at its worst rated an 8 (on a scale of 1-10). An examination of Plaintiff's thoracic and lumbar spine revealed a "diffuse area of pain from the thoracic to lumbar spine with increasing tenderness to palpation of the lumbar spine centrally and tenderness to palpation of the bilateral facet joints." There was no evidence of muscle spasm and an examination of Plaintiff's lower extremities revealed no evidence of motor or sensory deficit. *Id.*

A June 16, 2004 examination of Plaintiff's lumbar spine revealed "minimal tenderness to palpation of the lumbar spine centrally with increasing tenderness to palpation along the bilateral lumbar facet joints, more on the left than the right." (Tr. 342). There was no evidence of muscle spasm and an examination of Plaintiff's lower extremities revealed no evidence of motor or sensory deficit. *Id.*

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[8] If the Commissioner can make a

---

[8] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

**B. The ALJ's Decision**

The ALJ determined that Plaintiff suffers from the following severe impairments: (1) degenerative disc disease; (2) carpal tunnel syndrome; (3) status post right radial head and neck fracture; and (4) depression/anxiety. (Tr. 18). The ALJ further determined that these impairments, whether considered alone or in combination, fail to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 19-22). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

**1. The ALJ's Decision is Supported by Substantial Evidence**

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience,

---

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform unskilled sedentary[9] work activities subject to the following limitations: (1) she requires a sit/stand option; (2) she cannot perform repetitive fingering or overhead activities; (3) she cannot work on uneven floors or flooring that is subject to becoming wet and/or slippery; (4) she cannot push or pull any amount; (5) she possesses limited use of her right upper extremity; and (6) she needs one scheduled bathroom break each hour. (Tr. 20).

With respect to Plaintiff's mental impairments the ALJ further concluded that Plaintiff experiences mild to moderate symptoms of anxiety/depression. *Id.* The ALJ further concluded that Plaintiff experiences mild limitations in her ability to engage in daily activities; mild limitations in her ability to engage in social functioning; moderate limitations in her ability to concentrate and complete tasks in a timely manner; and has never experienced an episode of

---

[9] Sedentary work involves lifting "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567. Furthermore, while sedentary work "is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.*

decompensation. (Tr. 19). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Donald Hecker.

The vocational expert testified that there existed approximately 5,500 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 636-37). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

On appeal, Plaintiff asserts a single claim. She argues that the ALJ improperly discounted her subjective allegations of pain and limitation. At the administrative hearing, Plaintiff testified that she is unable to work because of back pain which radiates into her hip and left lower extremity. (Tr. 519). She further testified that she is prevented from working due to ongoing problems with her knees and wrists. *Id.* Plaintiff testified that she experiences "constant" pain throughout her "whole body." (Tr. 623). She reported that she can only walk 20 feet, stand for 10 minutes, and sit for 10-15 minutes. She testified that she cannot lift more than five pounds. *Id.* Plaintiff asserts that this testimony confirms that she is unable to perform any substantial gainful activity. The ALJ concluded that Plaintiff's "testimony with respect to the extent and severity of her impairments and resulting functional limitations is not credible." (Tr. 19).

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

16

*Walters*, 127 F.3d at 531 (citations omitted).  This standard is often referred to as the *Duncan* standard.  *See Workman v. Comm'r of Soc. Sec.*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record."  *Id.* (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference."  *Id.* (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony").  It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand.  The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded.  *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

There is no question that Plaintiff suffers from severe impairments which significantly limit her ability to perform work activities.  However, the objective medical evidence simply fails to support Plaintiff's testimony that she is unable to perform any and all work activities.  Plaintiff has participated in two functional capacity examinations, both of which revealed that she could perform work activities consistent with the ALJ's RFC determination.  (Tr. 178-86, 315-27).  Dr. Hornbach, one of Plaintiff's treating physicians, likewise concluded that Plaintiff was capable of

17

performing work activities consistent with the ALJ's RFC determination. (Tr. 178-86, 216). It must further be noted that none of Plaintiff's care providers have imposed on her limitations which are inconsistent with the ALJ's RFC determination. Finally, as the ALJ correctly observed, there exists evidence calling into question Plaintiff's subjective allegations. Dr. Hornbach reported that Plaintiff's "symptoms out weigh her physical exam findings." (Tr. 19, 226). Dr. Flood, who examined Plaintiff at the request of her attorney, reported that Plaintiff provided anatomically inconsistent responses to diagnostic testing. (Tr. 19, 337). In sum, the Court finds that there exists substantial evidence to support the ALJ's credibility determination.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.

Date: August 16, 2006                     /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge